UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

In re                                                    :

ARCAPITA BANK B.S.C.(c), et al.,                         :

                                                         :

                                                         :

                         Debtors,                        :

                                                         :
-------------------------------------------------------X

CAPTAIN HANI ALSOHAIBI,                                  :

                                                         :

                         Appellant,                      :

                                                         :
         - against -                                     :

                                                         :

ARCAPITA BANK B.S.C.(c), et al.,                         :

                                                         :

                         Appellees.                      :

                                                         :
-------------------------------------------------------X

**OPINION AND ORDER**

**Chapter 11**
**Bankruptcy Case No. 12-11076**
**Jointly Administered**

13 Civ. 5755 (SAS)
13 Civ. 5756 (SAS)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/6/14

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

These appeals arise out of the jointly administered chapter 11 cases of

Arcapita Bank B.S.C.(c) ("Arcapita") and several of its direct or indirect wholly

owned subsidiaries ("Debtors").[1]  Captain Hani Alsohaibi ("Appellant") appeals

_____

[1]    The affiliated debtors include Arcapita Investment Holdings Limited
("AIHL"), Arcapita LT Holdings Limited ("LT Holdings"), WindTurbine Holdings
Limited, AEID II Holdings, and Railinvest Holdings Limited.  The Debtors' cases
were administratively, but not substantively, consolidated.  Under the Debtors'
joint chapter 11 plan (the "Plan"), the Debtors were replaced by reorganized
debtors and new holding companies; for convenience, I will use the terms
"Debtors" or "Appellees" and not "Reorganized Debtors."

-1-

from two orders of the Bankruptcy Court: (1) the final order approving

replacement debtor-in-possession ("DIP") financing (the "Replacement DIP

Order") and (2) the order confirming the Plan (the "Confirmation Order").[2]

Following initial briefing in which Appellees addressed the merits of the appeals,[3]

Appellees moved to dismiss each appeal on grounds of equitable mootness.[4]

Because the Plan has become effective, and there has been a comprehensive

change in circumstances, I conclude that both appeals must be dismissed on

equitable mootness grounds.  Accordingly, I will not address the merits of these

appeals.

## I.    BACKGROUND

### A.    The Debtors' Business

Arcapita was incorporated in 1996 as a Bahrain Joint Stock Company,

operating under an "Islamic wholesale banking license" issued by the Central Bank

---

[2]      The Bankruptcy Court recently sustained the Debtors' objection to Appellant's claim of some $1.5 million, reducing it to $148.91 after finding the remainder was based on equity investments in non-debtor entities.  *See In re Arcapita Bank B.S.C. (c)*, No. 12-11076, 2013 WL 6141616, at *3-6 (Bankr. S.D.N.Y. Nov. 21, 2013).  The appeal from this order is not before me.

[3]      *See* Appellees' Consolidated Opening Brief ("Appellees' Opening Brief").

[4]      *See* Memorandum of Law in Support of Reorganized Debtors' Motion to Dismiss Appeals as Moot ("Debtors' Mem.").

of Bahrain ("CBB"), the regulatory agency charged with maintaining financial stability in Bahrain.[5]  It was privately held by some 360 shareholders.[6]  Arcapita, through its debtor and non-debtor subsidiaries ("Arcapita Group"), provided Shari'ah compliant alternative investments and operated as an investment bank.[7]

The Arcapita Group structured a typical third-party investment by first creating a Cayman Island "Transaction Holdco," owned by AIHL or LT Holdings, which acquired one hundred percent of the equity in a target company.[8]  The Arcapita Group retained between twenty and thirty percent of the equity in the Transaction Holdco, and created Cayman Island "Syndication Companies," "to which the Arcapita Group, in exchange for the equity in the Syndication Companies, transferred that portion of the equity of the Transaction Holdco that it intended to offer for sale to" third-party investors.[9]  Equity in the Syndication

---

[5]    Second Amended Disclosure Statement in Support of the Second Amended Joint Plan of Reorganization of Arcapita Bank B.S.C.(c) and Related Debtors Under Chapter 11 of the Bankruptcy Code ("Disclosure Statement") (Bankr. Dkt. No. 1038), at 42.

[6]    *See id.*

[7]    *See id.*

[8]    *See id.* at 43.

[9]    *Id.*

Companies was then sold to third-party investors.[10]

### B.    The Debtors' Bankruptcy Filing

The principal driver of the Debtors' filing was their inability to refinance, due to the Eurozone crisis and weak markets, a $1.1 billion syndicated loan which was set to mature on March 28, 2012 (the "Syndicated Facility").[11] After failed negotiations with the lenders, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on March 19, 2012.[12]  The United States Trustee appointed a committee of unsecured creditors (the "Committee"), which includes CBB and the National Bank of Bahrain.[13]  Following the petition date, AIHL sought ancillary relief from the Grand Court of the Cayman Islands, which led to the appointment of joint provisional liquidators (the "JPLs").[14]  In addition, holders of debt related to the Syndicated Facility formed an ad hoc group

---

[10]     *See id.*

[11]     *See id.* at 53.

[12]     *See id.* at 53-54.

[13]     *See id.* at 54.

[14]     *See* Debtors' Memorandum of Law in Support of Confirmation of Second Amended Joint Plan of Reorganization of Arcapita Bank B.S.C.(c) and Related Debtors Under Chapter 11 of the Bankruptcy Code (Bankr. Dkt. No. 1218) ¶ 12.

to represent the interests of the Syndicated Facility (the "Ad Hoc Group").[15]

The Debtors projected aggregate allowed claims of $2.757 billion in the Disclosure Statement.[16]  This included (1) Standard Chartered Bank's ("SCB") secured claim of some $96.6 million; (2) unsecured claims arising under various Murabaha agreements, such as the $1.1 billion owed under the Syndicated Facility, in addition to approximately $100 million owed pursuant to the "Arcsukuk Facility," and $255 million owed to CBB; and (3) Arcapita's unsecured debt of over $675 million from cash balances held on behalf of Transaction Holdcos, Syndication Companies, and third-party investors.[17]

### C.    Post-petition Financing

In December 2012, the Bankruptcy Court approved, without objection from Appellant, post-petition financing of $150 million (the "Fortress Facility").[18]

---

[15]    *See generally* Declaration of Matthew Bonanno, vice president of York Capital Management, a member of the Ad Hoc Group, in Support of the Second Amended Joint Plan of Reorganization of Arcapita Bank B.S.C.(c) and Related Debtors Under Chapter 11 of the Bankruptcy Code (Bankr. Dkt. No. 1222).

[16]    *See* Disclosure Statement at 69.

[17]    *See id.* at 48-51.

[18]    *See id.* at 68.  In January 2013, the Debtors prepaid approximately $35 million under the Fortress Facility. *See id.*

The Fortress Facility matured by its terms on June 14, 2013.[19]  Prior to the maturity date, the Debtors obtained a commitment from Goldman Sachs International ("Goldman") to provide $350 million in replacement DIP financing.[20]  $175 million was earmarked to repay the Fortress Facility and to fund the Debtors' operations until the effective date of the Plan.[21]  The remainder was directed to funding the Plan, including payment of SCB's $96.6 million secured claim.[22]  In March 2013, without objection from Appellant, the Bankruptcy Court approved the Debtors' entry into commitment documentation with Goldman.[23]

The Debtors subsequently filed a motion seeking approval of the replacement DIP financing; thereafter, Appellant filed an objection to the motion, citing procedural grounds.[24]  At a hearing on June 10, 2013,[25] the Bankruptcy Court overruled Appellant's objection, granted the Debtors' motion on an interim basis,

---

[19]     *See* Appellees' Opening Brief at 5.

[20]     *See id.* at 6.

[21]     *See id.*

[22]     *See id.*

[23]     *See id.*

[24]     *See id.* at 6-7.

[25]     The confirmation hearing was scheduled for the next day.

and scheduled a final hearing for June 24, 2013.[26]  Appellant neither sought a stay of the interim order nor appealed it.[27]  The Debtors closed the $175 million replacement DIP financing on June 13, 2013, and used $105 million to repay the Fortress Facility.[28]

On June 17, 2013, Appellant filed a second objection.  On June 24, 2013, the Bankruptcy Court conducted a final hearing and overruled Appellant's objections, including objections based on Shari'ah concerns.[29]  On June 26, 2013, the Bankruptcy Court entered the Replacement DIP Order, expressly finding that the financing was obtained in "good faith" pursuant to sections 363(m) and 364(e) of the Code.[30]  Appellant did not seek a stay of the Replacement DIP Order.[31]

### D.    The Plan and Confirmation

The Plan consists of subplans for each of the Debtors and provides  a highly complex framework for the orderly wind-down of their business operations. Among scores of other transactions, the Plan contemplated (1) the transfer of the

---

[26]     *See id.* at 8.

[27]     *See id.*

[28]     *See id.* at 10.

[29]     *See id.*

[30]     *See id.*

[31]     *See id.*

Debtors' property to reorganized debtors and nineteen new holding companies; (2) numerous settlements, including with SCB, which had threatened to block confirmation; (3) entry into the exit financing; and (4) the issuance of $550 million in "sukuk" certificates by one of the new holding companies.[32]  This framework was the product of extensive negotiations among the Debtors, the Committee, the JPLs, the Ad Hoc Group, and other stakeholders, "regarding the myriad claims and issues affecting the estates."[33]

     The Debtors' liquidation analysis highlights the benefits of the Plan over a hypothetical chapter 7 liquidation.  Holders of Syndicated Facility and Arcsukuk Facility claims were projected to recover 65.5 percent of their claims under the Plan versus a recovery of between 18.7 to 22.8 percent in a chapter 7 liquidation.[34]  Holders of general unsecured claims against Arcapita were projected

---

[32]     *See, e.g.*, 10/11/13 Declaration of Bradley Jordan, a managing director of Houlihan Lokey Capital, Inc., an advisor to the Committee, in Support of Reorganized Debtors' Motion to Dismiss Appeals as Moot ("Jordan Decl.") ¶¶ 10, 12-13, 18-19.  Sukuk certificates are structured to comply with Shari'ah principles.

[33]     Statement of Official Committee of Unsecured Creditors in Support of Confirmation of the Second Amended Joint Plan of Reorganization of Arcapita Bank B.S.C.(c) and Related Debtors Under Chapter 11 of the Bankruptcy Code ("Committee Statement") (Bankr. Dkt. No. 1253) ¶ 1.

[34]     *See* 6/6/13 Declaration of Matthew Kvarda, a managing director of Alvarez & Marsal North America, LLC, an advisor to the Debtors, in Support of Confirmation of Second Amended Joint Plan of Reorganization of Arcapita Bank B.S.C.(c) and Related Debtors Under Chapter 11 of the Bankruptcy Code ("Kvarda

to receive 7.6 percent of their claims under the Plan, compared with between 3.3 to 4.1 percent in a chapter 7 liquidation.[35]   General unsecured creditors of AIHL were projected to recover 58.9 percent under the Plan, compared with between 15.4 to 18.7 percent in a chapter 7 liquidation.[36]

Nearly every impaired class voted to the accept the Plan.[37]   During the confirmation hearing, the Bankruptcy Court addressed Appellant's argument, made at the financing hearing the previous day, that the Debtors should be liquidated immediately.   The Bankruptcy Court stated:

> I do not see counsel for [Alsohaibi] here today, but [the objection] had to do with the fact that liquidation was a better option than a chapter 11 reorganization, and it overlooks several things, including the liquidation analysis, and the fact that this is really a managed liquidation in any event, but just a very well managed one.  So that is explicitly overruled.  And I actually did not see an objection to confirmation by [Alsohaibi], but it certainly was mentioned yesterday, so I want to make sure that's addressed.[38]

The Bankruptcy Court entered the Confirmation Order on June 17, 2013.[39]

---

Decl.") (Bankr. Dkt. No. 1220) ¶ 13.

[35]   *See id.*

[36]   *See id.*

[37]   *See* Committee Statement ¶ 3.

[38]   Appellees' Opening Brief at 9 (citation omitted) (alterations in original).

[39]   *See id.*

Appellant did not seek a stay of the Confirmation Order.

### E.    Plan Implementation and Consummation

Due to the complexity of implementing the Plan, the Debtors delayed the effective date several times. At a hearing on August 27, 2013, the Bankruptcy Court noted the parties' "frustration" in getting to an effective date.[40] The Bankruptcy Court explained that it is "a very complicated plan and series of transactions contemplated under the plan. But, nonetheless, finality, and the need to go effective, I think everyone recognizes important end deadlines are crucial to that."[41] Thereafter, the Bankruptcy Court entered an order approving an implementation timeline for the Plan, setting September 17, 2013 as the effective date.[42] The required action under the timeline included:

> (i) conducting board meetings or similar authorizing actions necessary to approve consummation of the Plan transactions,
> (ii) providing notice to the Exit Financing arrangers of the closing of the Exit Financing on the Effective Date,
> (iii) advising the share registrar of Arcapita Bank to take all actions necessary to effect transfers of Arcapita Bank shares to one or more subsidiaries of RA Holding Corp.,
> (vi) initiating all actions necessary to implement the Plan in the Cayman Islands, including the merger of certain subsidiaries of Arcapita Bank, and

---

[40]    8/17/13 Hearing Transcript, Ex. B to Debtors' Mem., at 5:19.

[41]    *Id.* at 5:20-24.

[42]    *See* Debtors' Mem. at 4.

(v) executing substantially all Plan implementation documents.[43]
The Debtors completed these steps and the Plan became effective as scheduled.[44]

Following the effective date, the Debtors' assets were transferred to
the reorganized debtors and the new holding companies.[45]  Participating
shareholders of Arcapita transferred all of their interests in Arcapita to the new
holding companies in exchange for the issuance of seventy-eight million
shareholder warrants.[46]  The reorganized debtors consummated certain settlements
that were integral to the Plan, including: (i) a settlement of claims of senior
management; (ii) a settlement with the Syndication Companies and their investors,
which established a framework for the coordinated disposition of jointly-owned
investment assets; (iii) the settlement with SCB; and (iv) a settlement resolving the
characterization and treatment of the Debtors' headquarters lease and related
claims.[47]  The exit financing was funded, and the proceeds were used to make
distributions of $95 million to SCB under the settlement; $29.1 million on account
of administrative claims; and $40.3 million to fund an escrow account to pay

---

[43]    Jordan Decl. ¶¶ 8-9.

[44]    *See id.* ¶ 9.

[45]    *See id.* ¶ 12.

[46]    *See id.* ¶ 13.

[47]    *See id.* ¶ 21.

professional fee claims.[48]  RA Invest Limited, a Cayman company and one of the new holding companies, issued $550 million in sukuk certificates in the form of a definitive registered certificate to creditors of Arcapita and AIHL in accordance with a Mudaraba agreement.[49]  RA Holding Corp. issued 29.5 million new equity securities to be distributed to holders of allowed claims to discharge the claims held by creditors of Arcapita and AIHL.[50]

New boards of directors were appointed for each of the reorganized debtors and the new holding companies, which adopted new governing documents.[51]  These boards have held meetings and have begun to make decisions with respect to the assets under their control relating to the sale of, and additional investments in, these assets.[52]  The reorganized debtors entered additional business transactions and activities in the ordinary course, including the retention of various

---

[48]    *See id.* ¶¶ 18, 20.  As of the day following the Effective Date, approximately $10.7 million of the exit financing proceeds remained in the Debtors' bank accounts, in addition to cash held in such accounts prior to the Effective Date.  *See id.* ¶ 18.

[49]    *See id.* ¶ 19.

[50]    *See id.* ¶ 20.

[51]    *See id.* ¶ 17.

[52]    *See id.*

professionals, such as auditors and service providers.[53] All of the employees of the Debtors and their subsidiaries have been terminated and the reorganized debtors and the new holding companies have no employees or management other than their directors.[54]  The Debtors contend that by virtue of these transactions, the Plan has been substantially consummated.[55]

## II.   LEGAL STANDARD

### A.   Appeals of Bankruptcy Court Orders

Bankruptcy appeals are governed by the procedural rules set forth in Section VIII of the Federal Rules of Bankruptcy Procedure.  Rules 8009 and 8010 relate to the filing of appellate briefs, whereas Rule 8011 concerns motion practice before the district court.  Under Rule 8011, "[a] request for an order or other relief shall made by filing with . . . the district court . . . a motion for such order or relief" and may be supported by briefs and affidavits.[56]  A motion under Rule 8011 can be

---

[53]    *See id.* ¶ 22.

[54]    *See id.*

[55]    *See id.* ¶ 10.

[56]    Fed. R. Bankr. P. 8011(a).

made at any time,[57] and may be acted on by the court without a hearing.[58]

## B.    Equitable Mootness

"'[E]quitable mootness is a pragmatic principle, grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable.'"[59]   An appeal from an order of a bankruptcy court should be dismissed when, "even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable."[60]   The doctrine "requires the district court to carefully balance the importance of finality in bankruptcy

---

[57]    *See, e.g.*, *Leighton v. E-II Holdings Inc. (In re E-II Holdings Inc.)*, No. 94 Civ. 2246, 1995 WL 387650, at *6 n.2 (S.D.N.Y. June 30, 1995) (stating "[t]here is no timing requirement for motions under Fed. R. Bankr. P. 8011").

[58]    *See* Fed. R. Bankr. P. 8011(b).

[59]    *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 144 (2d Cir. 2005) (quoting *MAC Panel Co. v. Virginia Panel Corp.*, 283 F.3d 622, 625 (4th Cir. 2002)).

[60]    *Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.) ("Chateaugay I")*, 988 F.2d 322, 325 (2d Cir. 1993) (stating that principles of mootness are "especially pertinent in bankruptcy proceedings, where the ability to achieve finality is essential to the fashioning of effective remedies").  *Accord R[2] Invs., LDC v. Charter Commc'ns (In re Charter Commc'ns, Inc.)*, 691 F.3d 476, 481 (2d Cir. 2012) ("Unlike constitutional mootness, which turns on the threshold question of whether a justiciable case or controversy exists, equitable mootness in the context presented here is concerned with whether a particular remedy can be granted without unjustly upsetting a debtor's plan of reorganization.").

proceedings against the appellant's right to review and relief."[61]

Equitable mootness "has been applied in two situations" in this Circuit: "'when an unstayed order has resulted in a comprehensive change in circumstances, and when a reorganization is substantially consummated.'"[62] The Second Circuit has identified five factors (the "*Chateaugay* factors") to be applied when determining whether to dismiss an appeal of a bankruptcy court order as equitably moot:

> (a) the court can still order some effective relief; (b) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity; (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court; (d) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and (e) the appellant pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.[63]

---

[61]     *Charter Commc'ns*, 691 F.3d at 481.

[62]     *Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65, 80 (S.D.N.Y. 2010) (quoting *Kenton County Bondholders Committee v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 374 B.R. 516, 522 (S.D.N.Y. 2007)) (quotations omitted).  *Accord Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994).

[63]     *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)* ("*Chateaugay II*"), 10 F.3d 944, 952-53 (2d Cir. 1993) (citations and quotations

Courts in this Circuit have emphasized the importance of obtaining a stay from an order confirming a plan.  As explained by the Second Circuit, "[i]n the absence of any request for a stay, the question is not solely whether we *can* provide relief without unraveling the Plan, but also whether we *should* provide such relief in light of fairness concerns."[64]

Equitable mootness of an appeal of a bankruptcy court order confirming a chapter 11 is presumed when the plan has been substantially consummated during the pendency of the appeal.[65]  The Code defines substantial consummation as "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan."[66]  Courts have also applied this presumption when an

_____

omitted).

[64]     *Metromedia*, 416 F.3d at 145 (emphasis in original).

[65]     *See Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.) ("Chateaugay III")*, 94 F.3d 772, 776 (2d Cir. 1996) ("Reviewing courts presume that it will be inequitable or impractical to grant relief after substantial consummation of a plan of reorganization.").

[66]     11 U.S.C. § 1101(2).  Substantial consummation precludes modification of a plan.  *See id.* § 1127.

unstayed order has resulted in a comprehensive change in circumstances.[67]

The doctrine of equitable mootness is perhaps most often associated with orders confirming reorganization plans, but it is also applies to orders confirming chapter 11 liquidation plans.[68]  Indeed, the doctrine is not limited to appeals from confirmation orders, and has been applied in a variety of contexts, including to appeals from orders addressing settlements,[69] injunctive relief,[70] leave

---

[67]      *See Motors Liquidation Co.*, 430 B.R. at 80; *Kassover v. Gibson*, No. 02 Civ. 7978, 2003 WL 21222341, at *2 (S.D.N.Y. May 27, 2003), *aff'd*, *In re Kassover*, 98 Fed. App'x 30 (2d Cir. 2004).  *See also In re Leatherstocking Antiques, Inc.*, No. 12 Civ. 7758, 2013 WL 5423995, at *4 (S.D.N.Y. Sept. 27, 2013); *Allstate Ins.*, 174 B.R. at 889.

[68]      *See Schaefer v. Superior Offshore Int'l, Inc. (In re Superior Offshore Int'l, Inc.)*, 591 F.3d 350, 353-54 (5th Cir. 2009) (applying equitable mootness analysis to liquidation plan); *In re BGI, Inc.*, Nos. 12 Civ. 7714, 12 Civ. 7715, 13 Civ. 0080, 2013 U.S. Dist. LEXIS 77740, at *35-37 (S.D.N.Y. May 22, 2013); *Cadle Co. II, Inc. v. PC Liquidation Corp. (In re PC Liquidation Corp.)*, No. 06 Cv. 1935, 2008 WL 199457, at *5 (E.D.N.Y. Jan. 17, 2008) (finding "the doctrine of equitable mootness is not limited to appeals of orders confirming reorganization plans"); *ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 367 B.R. 84, 96 (S.D.N.Y. 2007) (applying equitable mootness in case where the "Debtors have been liquidated and effectively cease to exist").

[69]      *See In re Adelphia Commc'ns Corp.*, 222 Fed. App'x 7 (2d Cir. 2006); *PC Liquidation Corp.*, 2008 WL 199457, at *5; *Delta Air Lines*, 374 B.R. at 522-25; *D'urso v. Durso Supermarkets, Inc. (In re Durso Supermarkets, Inc.)*, No. 93 Civ. 5697, 1994 WL 17913 (S.D.N.Y. Jan. 20, 1994).

[70]      *See Allstate Ins.*, 174 B.R. at 890-91.

to file untimely proofs of claim,[71] class certification,[72] property rights,[73] asset sales,[74] and payment of prepetition wages.[75]  The doctrine has also been applied to financing orders.[76]

## III.   DISCUSSION

### A.    The Parties' Arguments

Appellees argue that the Plan has been substantially consummated and that a comprehensive change of circumstances has resulted from implementation of the Confirmation Order and Replacement DIP Order.  Appellant does not dispute either contention.  Nor does Appellant address the *Chateaugay* factors, except to claim that Appellees "exaggerate the importance of a stay, which may be important

---

[71]    *See BGI, Inc.*, 2013 U.S. Dist. LEXIS 77740, at *35-37.

[72]    *See id.*

[73]    *See Samson Energy Resources Co. v. Semcrude, L.P. (In re Semcrude, L.P.)*, 728 F.3d 314 (3d Cir. 2013).

[74]    *See Motors Liquidation Co.*, 430 B.R. at 80-83; *Kassover*, 2003 WL 21222341, at *2 (appeal from order in chapter 7 case approving settlement and stock purchase agreement creating new entity was equitably moot where appellant had opportunity to, but did not, apply for stay prior to consummation of merger, resulting in a comprehensive change of circumstances).

[75]    *See Drawbridge Special Opportunities Fund v. Shawnee Hills, Inc. (In re Shawnee Hills, Inc.)*, 125 Fed. App'x 466 (4th Cir. 2005).

[76]    *See Desert Fire Protection v. Fontainebleau Las Vegas Holdings, LLC (In re Fontainebleau Las Vegas Holdings, LLC)*, 434 B.R. 716 (S.D. Fla. 2010).

in reorganization but is not in liquidations."[77]

Appellant argues that the Debtors' motion to dismiss is an improper sur reply because they had already filed a brief in response to his opening appellate brief.[78]  In making this argument, Appellant relies on Federal Rule of Civil Procedure 12(b).[79]  However, Federal Rule of Civil Procedure 12(b) is not applicable to these appeals, and Appellant has confused appellate briefing under Rules 8009 and 8010 with motion practice under Rule 8011.  Accordingly, Appellant's procedural arguments are rejected.[80]  Similarly, Appellant's request for discovery and an evidentiary hearing is not supported by the Bankruptcy Rules or the facts of this case and is denied.[81]

---

[77]     Appellant's Mem. at 5.  Appellant also contends, "Appellees do not address the Appellant's point below, which is that had he sought a stay, Goldman Sachs would have likely taken the opportunity to foreclose on Arcapita's assets." *Id.*

[78]     *See id.* at 3-5.

[79]     *See id.* at 4 ("A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed") (quoting Fed. R. Civ. P. 12(b)).  Appellant also cites to this Court's individual rules.  *See id.*

[80]     Appellant is correct that Debtors' initial memorandum of law violated my individual rule regarding the font size to be used in footnotes.  *See* Individual Rules and Procedures of Judge Shira A. Scheindlin, Rule IV.G.  Even were I to reject Debtors' memorandum on this basis, the Jordan Declaration, the record below, and Debtors' reply brief provide ample grounds to dismiss these appeals as equitably moot.

[81]     *See* Appellant's Mem. at 6 (citing Fed. R. Civ. P. 12(d)).

Appellant also contends that the doctrine of equitable mootness does

not apply "in the context of a liquidation."[82]  Although the Second Circuit has not

expressly ruled on this issue, based on the authority already cited in this Opinion

and Order, Appellant's argument is meritless.  In addition, as explained by the

Supreme Court, "the two recognized policies underlying Chapter 11 [are]

preserving going concerns and maximizing property available to satisfy

creditors."[83]  In fact, the Code expressly authorizes chapter 11 plans to liquidate all

or some of a debtor's assets.[84]  It is uncontested that the Debtors' carefully

negotiated Plan – while ultimately effecting a liquidation of the Debtors and the

---

[82]     *Id.* at 5.

[83]     *Bank of America Nat'l Trust and Sav. Ass'n v. 203 North LaSalle Street P'ship*, 526 U.S. 434, 453 (1999) (citing *Toibb v. Radloff*, 501 U.S. 157, 163 (1991)).  *Accord Toibb*, 501 U.S. at 163 (recognizing that chapter 11 embodies the Bankruptcy Code's general policy of "maximizing the value of the bankruptcy estate").  *See also Cadle Co. II, Inc. v. PC Liquidation Corp. (In re PC Liquidation Corp.)*, 383 B.R. 856, 866 (E.D.N.Y. 2008) (stating that "while the primary purpose of Chapter 11 is reorganization, liquidation is not prohibited. Reorganization encompasses rehabilitation and may include liquidation") (quotations omitted) (citing cases).

[84]     *See* 11 U.S.C. §§ 1129(a)(11) (stating that a plan must satisfy the condition that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, *unless such liquidation or reorganization is proposed in the plan*") (emphasis added); 1123(a)(5)(D) (stating that a plan shall provide adequate means for implementation including "sale of all or any part of the property of the estate"); 1123(b)(4) (stating that a plan may "provide for the sale of all or substantially all of the property of the estate").

-20-

creation of indefinitely operating reorganized debtors – yielded greater benefits

than a hypothetical chapter 7 liquidation.[85]  There is no reason to give less weight

to the final orders entered by the Bankruptcy Court just because the Plan did not

contemplate the continuing operation of the Debtors.

        Appellant also argues that equitable mootness is an exception to a

district court's "'virtually unflagging obligation to exercise jurisdiction'" that must

be used sparingly and "applied 'with a scalpel rather than an axe.'"[86]  While

Appellant is correct about these principles, he has neither demonstrated why use of

the doctrine is inappropriate in this case, nor indicated how this Court could

possibly afford him relief without completely undermining the Confirmation Order

and the Replacement DIP Order.

## B.    Equitable Mootness

        I find that these appeals are equitably moot.  Appellant does not

dispute that the Plan has been substantially consummated or that the exit financing

was integral to that Plan.  Based on the transfer of the Debtors' assets to the

reorganized debtors and the new holding companies, the payment of the exit

---

[85]    *See, e.g.*, Kvarda Decl. ¶ 13.  Furthermore, after considered analysis, the Debtors concluded that the structure under the Plan was more feasible than reorganization.  *See, e.g.*, Disclosure Statement at 78.

[86]    Appellant's Mem. at 5 (quoting *Charter Commc'ns*, 691 F.3d at 481-82).

financing, and the distributions made to settle and satisfy various claims, among

other transactions outlined in the Jordan Declaration, the Plan has been

substantially consummated.  In addition, there has been a comprehensive change of

circumstances as a result of Appellant's failure to seek a stay of either the

Confirmation Order or the Replacement DIP Order.  Accordingly, these appeals

must be dismissed unless Appellant can demonstrate that the *Chateaugay* factors

support permitting these appeals to be heard on the merits.[87]

### 1.    Whether Effective Relief Can Be Granted

Appellees argue that effective relief cannot be granted because

"[n]umerous parties have relied on the Replacement DIP Order and Confirmation

Order in taking actions that cannot be unwound."[88]  Appellees also note that "[t]he

syndicate of lenders who provided the Replacement DIP Financing and the Exit

Financing to the Debtors provided such financing to fund the Plan as it was written

. . . not to fund some other hypothetical plan that Appellant would like."[89]

Appellant provides no guidance on what relief the Court could order

that would satisfy this factor.  Based on all the transactions that have occurred, it

---

[87]      *See Chateaugay II*, 10 F.3d at 952.

[88]      Appellees' Mem. at 12.

[89]      *Id.*

-22-

seems unlikely that an effective remedy can still be granted in this case.[90]

Unwinding the transactions would not constitute "effective relief" because under

the unchallenged liquidation analysis, the Plan provides a greater recovery to

unsecured creditors than the alternative suggested by the Appellant, the liquidation

of the Debtors.[91]  Accordingly, Appellant fails to satisfy the first *Chateaugay*

factor.

### 2.    Whether Such Relief Will Negatively Affect Re-emergence of the Debtor

The Debtors have been liquidated and effectively cease to exist.  As a

result, the second *Chateaugay* factor is inapposite.

### 3.    Whether Such Relief Will Unravel Intricate Transactions

Relief on these appeals would be inequitable because it would

"unravel intricate transactions so as to knock the props out from under the

authorization for every transaction that has taken place and create an

unmanageable, uncontrollable situation for the Bankruptcy Court."[92]  Numerous

---

[90]     Apart from whether the Debtors could repay the $350 million in DIP financing or complete the steps necessary to unwind the financing transaction itself, statutory mootness raises an additional problem with respect to the Replacement DIP Order. *See, e.g.*, *In re General Growth Props., Inc.*, 423 B.R. 716, 721-22 (S.D.N.Y. 2010) (discussing statutory mootness under section 364(e)).

[91]     *See Motors Liquidation Co.*, 430 B.R. at 82.

[92]     *Chateaugay II*, 10 F.3d at 953.

settlements were reached and implemented, including the payment of millions of dollars in severance payments made to former employees.  The new holding companies were created, and a complex series of mergers and dissolutions have been consummated.  Hundreds of millions of dollars have been distributed in cash or equity interests.  These transactions cannot be unraveled, nor would it be equitable to do so for the sole purpose of providing Appellant relief on this appeal. In addition, canceling the exit financing would "knock the props out from under the authorization for every transaction that has taken place" under the Plan.[93] Thus, Appellant fails to satisfy the third *Chateaugay* factor.

### 4.   Whether Parties Adversely Affected Have Had Notice and Opportunity to Participate in the Appeal

Appellant does not contend that the numerous third parties who have participated in and relied on the transactions completed pursuant to the Plan have been notified.  Accordingly, Appellant fails to satisfy the fourth *Chateaugay* factor.

### 5.   Whether Appellant Pursued a Stay with Diligence

Appellant did not seek a stay of either order.  There is no support for Appellant's contention that seeking a stay of the orders was not important because the Plan resulted in the liquidation of the Debtors.  It should have been obvious to Appellant – given the complexity of the Plan – that the Debtors and third parties

---

[93]     *Id.*

would have to perform hundreds of transactions to implement and carry out its terms.

In sum, Appellant failed to establish the four *Chateaugay* factors that are relevant to these appeals.  As I have previously explained,

> Even apart from the precise application of each of the *Chateaugay* factors in this case, the essence of the equitable mootness doctrine is to prevent appeals from going forward in cases where granting relief, even where hypothetically possible, would be inequitable.[94]

This is one of those cases.

## IV.    CONCLUSION

For the reasons discussed above, these appeals are dismissed as equitably moot.  The Clerk of the Court is directed to close these appeals.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           January   , 2014

---

[94]    *Adelphia Commc'ns Corp.*, 367 B.R. at 99.

**- Appearances -**

**For Appellant:**

Tally M. Wiener, Esq.
Law Office of Tally M. Wiener, Esq.
119 West 72nd Street, PMB 350
New York, NY 10023
(212) 574-7975

**For Appellees:**

Andrew M. Leblanc, Esq.
Milbank, Tweed, Hadley & McCloy LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
(202) 835-7574

Dennis F. Dunne, Esq.
Evan R. Fleck, Esq.
Anne Knight, Esq.
Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000